J-A10018-24

2024 PA Super 208

| | | |
|---|---|---|
| BRIAN FELDMAN | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| CP ACQUISITIONS 25, L.P., TEREX CORPORATION, MODERN GROUP LTD, SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY, NATIONAL RAILROAD PASSENGER CORPORATION, BOZZUTO CONSTRUCTION COMPANY, VITO BRACCIA CONSTRUCTION, LLC, ALTINO CONCRETE CONSTRUCTION, LLC AND ALTINO CONCRETE CONSTRUCTION, LLC, CP ACQUISITIONS 25, LLC, CP ACQUISITIONS 25 GP, LLC, AND 10 UNION AVE ASSOCIATES, LP | : | No. 501 EDA 2023 |
| | : | |
| APPEAL OF: VITO BRACCIA CONSTRUCTION, LLC | : | |

Appeal from the Judgment Entered January 26, 2023
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s): 200500942

BEFORE: LAZARUS, P.J., PANELLA, P.J.E., and BECK, J.

OPINION BY BECK, J.:                    **FILED SEPTEMBER 12, 2024**

Vito Braccia Construction, LLC ("VBC") appeals from the judgment entered by the Philadelphia County Court of Common Pleas ("trial court") in favor of Brian Feldman ("Feldman"). On appeal, VBC challenges the trial court's denial of its request for judgment notwithstanding the verdict ("JNOV") based upon VBC's claimed immunity under the Workers' Compensation Act

and an alleged material variance between Feldman's pleading and his proof at trial. VBC further seeks a new trial, challenging the weight of the evidence presented to support the jury's verdict and the admissibility of photographs of Feldman's injuries. For the reasons that follow, we affirm.

The trial court aptly summarized the facts and procedural history of this matter:

> This case involves a workplace electrocution accident which inflicted grievous injuries on [Feldman], while he was engaged in a tree removal project. Cross Properties[1] had acquired property in Bala Cynwyd and had engaged different contractors, including Bozzuto Construction and Altino Concrete Construction, to construct an apartment building on it. (N.T. 12:19-23, March 30, 2021; 54:2-7, October 26, 2022.) This project was known as the Kelly Project (hereinafter "the Kelly"). Near the end of construction on the Kelly, David Blumenfeld, a real estate developer and managing member of the Cross Properties entity that owned [10] Union Avenue, the property where the Kelly was constructed,[2] decided he wanted to have several trees, which blocked what would otherwise be a good view of center city Philadelphia, removed. (N.T. 24:18-23, March 30, 2021; 22:2-7, October 27, 2022.) These trees were not located on the same property as the Kelly, but rather on two adjacent properties.

---

[1] Cross Properties is not a legal entity, but rather a group of several entities including CP Acquisitions 25, LLC; CP Acquisitions 25 GP, LLC; CP Acquisitions 25, L.P.; and 10 Union Avenue Associates L.P. (N.T. 13:24-14:5, 15:20-16:20, 18:11-17, 18:23-19:12, March 30, 2021.) [For convenience, we refer to these entities together as Cross Properties.]

[2] 10 Union Avenue Associates owned the property on which the Kelly was located. 10 Union Avenue Associates was controlled by another company in Cross Properties' corporate structure. David Blumenfeld was a managing member of the company that had authority to make decisions regarding the property. However, the name of that company was unclear from the testimony. (N.T. 15:20-16:20, March 30, 2021.)

Some of the trees were located on property at 29 Bala Avenue, while others were located on property owned by [South Eastern Pennsylvania Transit Authority ("SEPTA")] upon which there were train tracks and overhead high voltage power lines. (N.T. 153:3-19, 155:24-156:12, October 24, 2022.)

Mr. Blumenfeld asked Jerry Gallagher, senior vice president of development and construction for Cross Properties,[3] to make arrangements for the removal of the trees. (N.T. 24:18-23, March 30, 2021.) Jerry Gallagher reached out to Bozzuto Construction, the general contractor on the Kelly project, to ask them if they would find a contractor for the tree removal job. Bozzuto declined because tree removal companies they contacted did not want to go near the power lines. (N.T. 102:5-103:1, April 21, 2021; 81:13-82:1, October 26, 2022.)

Mr. Gallagher then reached out to Vito Braccia[,] Sr., owner of Altino Concrete Construction (hereinafter "Altino") and [VBC][4] to see if he would take on the tree removal project. (N.T. 55:2-5, October 26, 2022.) Mr. Braccia contacted Bruce Ross of Colonial Tree Service, Inc. (hereinafter "Colonial"). (N.T. 22:21-23:18, October 27, 2022.) Colonial had been doing work for Vito Braccia for years and had previously been subcontracted by Altino for work at the Kelly. (N.T. 55:18-21, April 21, 2021; 133:7-134:20, 136:16-21, October 25, 2022.) Mr. Braccia and Mr. Ross arranged to meet and walk the site, and Mr. Braccia pointed out which trees needed to be removed. (N.T. 136:1-139:20, October 25, 2022.) The power lines were not discussed during this visit to the site. Following the site walk, Mr. Ross gave Mr. Braccia the price for the job and Mr. Braccia, in turn, contacted Cross Properties to provide

_____

[3] Mr. Gallagher was employed by a company called Cross Prop. P&B, which is not a defendant in this case. (N.T. 16:18-8, March 30, 2021.)

[4] At the time of the accident, Mr. Braccia was employed by Vito Braccia Construction and he testified that everything he did regarding the tree removal project was done on behalf of VBC. (N.T. 16:5-11, October 27, 2022.)

a marked-up price for the work, to which Cross Properties agreed. (N.T. 42:13-18, October 27, 2022.)[5]

Despite the known hazard posed by the power lines, Vito Braccia did no preplanning for the tree removal project, and even admitted that he, on behalf of VBC, failed to live up to his safety responsibilities. (N.T. 68:8-69:12, October 26, 2022; 13:7-15, October 27, 2022.) He failed to reach out to SEPTA or [Philadelphia Electric Company ("PECO")] to see if the location of the work would expose the workers to hazards, failed to complete SEPTA's right of entry form to get approval to enter SEPTA property and receive safety training and support from SEPTA, failed to arrange to have the power lines deenergized while the work was ongoing, failed to take any steps to guard the power lines to ensure an accident could not happen, and failed to complete a job hazard analysis. (N.T. 63:15-64:18, October 26, 2022; 34:15-24, October 27, 2022.) This complete failure to preplan the work and take precautions in response to a known safety hazard contravened OSHA's requirements as well as construction industry standards such as [] those released by the American Society of Safety Engineers, which require general, prime, and controlling contractors to preplan the work, identify safety hazards, and take steps to eliminate or substantially reduce the risks.[6] (N.T. 65:12-71:16, October 26, 2022.)

VBC's failure to preplan the work and take safety precautions had catastrophic consequences. Using a crane, Colonial removed the first four trees without incident. (N.T. 160:24-161:14, October 25, 2022.) However, the fifth tree Colonial tried to remove was on SEPTA property and only five feet horizontally from a 138,000-volt overhead power line, well within the 15-foot radius that is considered dangerous. (N.T. 164:20-

_____

[5] Notably, while Vito Braccia asserted he was acting on behalf of VBC, both David Blumenfeld and Jerry Gallagher from Cross Properties, as well as Bruce Ross from Colonial, believed they were contracting with Altino for the tree removal project. (N.T. 130:18-133:6, March 30, 2021; 137:19-138:3, April 21, 2021; 177:10-178:1, October 25, 2022.)

[6] Although this Court found that there was not a contract between Cross Properties and VBC, VBC acted as the general contractor on the tree removal project.

165:12, October 24, 2022.) A segment of the tree was strapped to the crane's hoist line and cut. (N.T. 166:17-168:6, October 25, 2022.) As the tree segment was being lifted, the electricity from the power line arced to the hoist line, traveled through the crane body and then shot out from the crane's front bumper to the front bumper of Colonial's log truck, which was nearby. (N.T. 168:7-171:25, October 25, 2022.) At that very moment, [] Feldman, who had been working with a chainsaw to cut up the pieces of tree, was walking in between the crane and the log truck. (N.T. 157:10-13, 170:22-171:10, October 25, 2022.) The current electrocuted him and inflicted extensive and severe burns. [] Feldman was found on the ground, "semiconscious" and moaning in pain, with his Kevlar pants completely melted off. (N.T. 170:3-14, October 25, 2022.)

[] Feldman spent the next six weeks in the burn unit at Jefferson Hospital. (N.T. 120:15-18, October 26, 2022.) Within a day, he coded and had to be resuscitated. (N.T. 100:23-101:15, October 27, 2022.) He had suffered burns to 62.5 percent of his body, with 20 percent of his body sustaining third degree burns. (N.T. 93:15-17, 101:4-10, October 24, 2022.) The burns covered his neck, torso, upper right arm, entire left arm, both hands and both thighs. (N.T. 93:1-95:18, October 24,2022; P-59.) The electricity blew out his left quadricep and right pectoral muscles, leaving him with no muscle tissue in those locations. (N.T. 122:19-124:13, October 26, 2022.)

Because of the risk of infection, [] Feldman had to undergo debridement procedures to remove his dead and decaying flesh. (N.T. 118:2-25, 129:17-130:5, October 24, 2022.) Extensive skin grafts were required. (N.T. 130:6-16, October 24, 2022.) [] Feldman's burns leaked causing him to lose fluids, so he needed to be pumped with more. (N.T. 105:19-107:22, October 24, 2022.) As a result, his organs swelled up creating pressure in his abdomen, a condition known as abdominal compartment syndrome. (N.T. 108:16-110:5, October 24, 2022.) An emergency decompressive laparotomy, where [] Feldman's abdomen was cut open and a plastic bag was placed over the top to allow his organs to expand, was necessary to relieve the pressure the swelling caused. (N.T. 109:1-113:9, October 24, 2022.) He also suffered from kidney failure. (N.T. 113:12-20, October 24, 2022.) [] Feldman, a body builder and former Mr. Philadelphia, lost almost 100 pounds while he was in the hospital. (N.T. 100:7-19, October 26, 2022; 112:11-12, October 27, 2022.)

The pain suffered by [] Feldman through this ordeal was indescribable. At trial [] Feldman and his wife, Melissa, described the agony of dressing changes, recounting how [] Feldman would scream out in pain and ask Melissa to just let him die as bandages were ripped off his body like Velcro. (N.T. 114:23-115:1, October 26, 2022; 104:8-105:3, October 27, 2022.) [] Feldman described the procedures as torture and at times had to be held down by nurses as he was being treated. (N.T. 113:14-114:11, October 26, 2022.) He repeatedly reiterated that words could not describe the pain he felt. (N.T. 112:24-113:2, 116:4-9, 117:2-3, October 26, 2022.)

[] Feldman's troubles did not end with his hospital stay. As a result of the electrical injuries he sustained, [] Feldman's trachea began closing. He underwent a tracheal resection procedure to help open his airway, but after about a month his trachea began to close again. (N.T. 138:11-141:6, October 26, 2022.) He now needs regular surgeries every couple of months to remove the scar tissue that is constantly building in his trachea and allow him to breathe. Through the time of trial, he had undergone 22 throat surgeries and he is expected to require 60 to 100 more. (N.T. 136:5-137:24, October 24, 2022; 48:20-49:17, October 25, 2022.)

[] Feldman also now suffers from memory loss, has floaters in his eyes which affect his vision, and struggles to use his right hand. (N.T. 133:2-12, October 24, 2022; 26:25-27:6, October 25, 2022; 132:2-134:5; October 26, 2022.) He has extensive scarring which is a cause of great embarrassment. (N.T. 148:11-149:11, October 26, 2022.) He thinks regularly about the pain of his injuries and has nightmares about his breathing problems. (N.T. 137:2-13, October 26, 2022.) He can no longer be the extremely active man he was before, and this has devastated him emotionally. (N.T. 137:14-23, October 26, 2022.) He sees a therapist to try to help with these emotional injuries. (N.T. 137:24-138:7, October 26, 2022.) [] Feldman's severe injuries have rendered him unable to work again. (N.T. 211:16-19, October 25, 2022.)

[] Feldman filed suit against VBC and, following a five-day trial, the jury found that VBC was negligent and awarded [] Feldman $15,500,000 in damages. VBC filed motions for JNOV

and for a new trial, which this Court denied, and judgment was entered on the verdict.

Trial Court Opinion, 8/22/2023, at 1-6 (footnotes in original).

VBC filed a timely notice of appeal. Both VBC and the trial court have complied with Rule 1925 of the Pennsylvania Rules of Appellate Procedure. VBC raises the following issues for our review:

1. Whether [JNOV] is required because a material variance existed between [Feldman's] pleading and his proof at trial?

2. Whether [JNOV] is required because [VBC] is clearly entitled to immunity under the Workers' Compensation Act?

3. Whether, in the alternative, this Court should order a new trial at which statutory employer immunity will be litigated and subject to fact-finding?

4. Whether a new trial is required because the verdict was against the weight of the evidence?

5. Whether a new trial is required because the trial court erred as a matter of law and abused its discretion in allowing, over defense objection, extremely gruesome and graphic photographs of [Feldman's] injuries to be shown to the jury?

VBC's Brief at 9 (issues reordered for ease of disposition).

## **JNOV**

VBC's first two issues challenge the trial court's denial of its motion for JNOV. We review the denial of a motion for JNOV pursuant to the following standard:

We review the denial of a request for JNOV for an error of law that controlled the outcome of the case or an abuse of discretion. In this context, an abuse of discretion occurs if the trial court renders a judgment that is manifestly unreasonable, arbitrary or

capricious; that fails to apply the law; or that is motivated by partiality, prejudice, bias or ill-will.

***Turnpaugh Chiropractic Health & Wellness Ctr., P.C. v. Erie Ins. Exch.***, 297 A.3d 404, 413 (Pa. Super. 2023) (internal citations, bracketing, and quotation marks omitted). We must view the facts of record in the light most favorable to the verdict winner and grant that party every favorable inference that can be drawn therefrom to discern whether there was sufficient competent evidence to sustain the verdict. ***Doe v. Wyoming Valley Health Care Sys., Inc.***, 987 A.2d 758, 764 (Pa. Super. 2009) (citation omitted). "Questions of credibility and conflicts in the evidence are for the trial court to resolve and the reviewing court should not reweigh the evidence." ***Id.*** As to questions of law, our scope of review is plenary. ***Holt v. Navarro***, 932 A.2d 915, 919 (Pa. Super. 2007).

> There are two bases upon which [JNOV] can be entered: one, the movant is entitled to judgment as a matter of law, and/or two, the evidence was such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant. With the first, a court reviews the record and concludes that even with all factual inferences decided adverse to the movant the law nonetheless requires a verdict in his favor, whereas with the second, the court reviews the evidentiary record and concludes that the evidence was such that a verdict for the movant was beyond peradventure.

***Id.*** (bracketing in original; citation omitted).

Material Variance

VBC contends that the trial court erred in failing to grant its request for JNOV because there was a material variance between the facts pled in

- 8 -

Feldman's complaint and the evidence he adduced at trial. VBC's Brief at 50-54. Feldman averred in his complaint that the tree removal project was within the scope of work for the Kelly. *Id.* at 50-51. At trial, however, counsel for Feldman opened by stating that the case involved "two projects, two very different projects"—one being the Kelly and the other being the tree removal. *Id.* at 51 (emphasis omitted). According to VBC, "[t]his was the first time that [Feldman] ever presented this theory of the case to VBC, any other party, or the court—and it varied materially from the case as pled and litigated up until trial," likening Feldman's conduct to a "[t]rial by ambush." *Id.* at 51. Relying on *Reynolds v. Thomas Jefferson Univ. Hosp*, 676 A.2d 1205 (Pa. Super. 1996), VBC asserts that this constituted a change in the operative facts made after the running of the statute of limitations for claim of negligence alleged against VBC, requiring the grant of JNOV. VBC's Brief at 53-54.

The trial court disagreed, finding that there was no material variance between the pleadings and the evidence adduced at trial. Trial Court Opinion, 8/22/2023, at 16-17. The complaint fully set forth the claim of negligence against VBC and the evidence presented at trial was consistent with the theory pled. *Id.* at 18. Further, the trial court also assails VBC's failure to identify precisely what "evidence" presented was at odds with the pleadings, as VBC solely directs its argument to the opening statement made by Feldman's counsel, which the trial court observes is not "evidence." *Id.* (citing *Avent v. A. Bob's Towing*, 266 A.3d 645 (Pa. Super. 2021) (non-precedential

decision); ***Commonwealth v. Quinone***, 200 A.3d 1004, 1014 (Pa. Super. 2018); Pa. SSJI (Civil) § 1.107)).

Prior to addressing this claim, we note at the outset our confusion by VBC's argument that it was blindsided by the contention that the Kelly and the tree removal constituted two separate projects and that it first learned of this theory during Feldman's opening statement. The record reflects that in Altino's motion for summary judgment, it specifically pled that the discovery process—including deposition testimony provided by Mr. Braccia, as corporate designee for both Altino and VBC—revealed that the tree removal project was separate from the scope of work contemplated for the Kelly. ***See*** Altino's Motion for Summary Judgment, 2/7/2022, ¶22. Feldman, in response, admitted that this was true. Feldman's Response in Opposition to Altino's Motion for Summary Judgment, 3/10/2022, ¶ 22 (acknowledging that "discovery has revealed the tree removal job fell outside the scope of work for the 'Kelly Project'").

Turning to the argument raised, as the trial court observed, VBC cites only to counsel's opening statement to establish this claimed "material variance" between the pleadings and the evidence adduced at trial. ***See*** VBC's Brief at 50, 52. This is not a proper basis for JNOV. ***See Brown v. George***, 25 A.2d 691, 692 (Pa. 1942) ("A motion for judgment n. o. v. must be based upon pleadings and evidence and not upon arguments made by counsel to the jury."). Further, as the trial court again correctly observed, the law is clear

that the opening statement made by counsel is not evidence. *See Steltz v. Meyers*, 265 A.3d 335, 340, 348 (Pa. 2021) (acknowledging the propriety of the trial court's curative instruction that "statements and arguments made by counsel do not constitute evidence. They are not the facts. Evidence includes any testimony of witnesses, documents, and other exhibits submitted during the trial constitute facts[.]"). Nowhere in VBC's argument does it cite to any evidence of record to support is claim. *Cf. Reynolds*, 676 A.2d at 1209 ("[a] material variance consists of a departure in the **evidence** from the issues on which the cause of action must depend.") (emphasis added). This Court cannot and will not serve as counsel for any party; it is not our role to scour the record to find support for the claims raised. *Tr. Under Deed of Wallace F. Ott*, 271 A.3d 409, 421 (Pa. Super. 2021) (citations omitted). To the contrary, our Rules of Appellate Procedure expressly require that all fact-based claims be supported by a discussion of the evidence that support the claim, with citation to the record where the pertinent evidence can be found. Pa.R.A.P. 2119(d).

Regardless, *Reynolds* does not entitle VBC to relief. *Reynolds* involved a medical malpractice action brought against a hospital system and a particular doctor, Dr. Daniel Anthony Beneski. *Reynolds*, 676 A.2d at 1207-08. The complaint sounded in negligence based upon Dr. Beneski's intubation of the complainant, Charmaine Reynolds, resulting in injury. *Id.* The proof adduced at trial, however, in the form of expert testimony and an

accompanying report, was that a different physician, Dr. Christopher Chambers, was negligent in failing to refer Ms. Reynolds to a specialist after her hoarseness persisted for more than ten days. *Id.* at 1208-09.

Reviewing precedent, this Court concluded that a material variance between a pleading and the evidence adduced at trial occurs when a plaintiff raises a different legal theory, a different type of negligence, or changes the operative facts to support the claim. *Id.* at 1210 (citation omitted). It further recognized that "a variance is not material if the alleged discrepancy causes no prejudice to the adverse party." *Id.* (citation omitted).

The *Reynolds* Court found that although Ms. Reynolds continued to raise a claim sounding in negligence, the allegations pertained solely to Dr. Beneski's actions; the facts pertaining to Dr. Chambers, which were never pled, constituted a new cause of action because they changed the operative facts to support the negligence claim, and this change prejudiced the appellants:

> The operative facts supporting Dr. Chambers' alleged negligence relate to his failure to recognize the potential seriousness of appellee's hoarseness and his delay in referring her to a specialist. In order to defend against this allegation, appellant would have been required to retain an expert in the field of family practice. Appellee's complaint, however, alleged the negligence of Dr. Beneski and other hospital agents in their performance of the intubation. To defend against these allegations, appellant would have been required to, and did, retain an expert in the field of anesthesiology.

*Id.* at 1213.

- 12 -

In the case at bar, there was no new claim raised at trial and no change to the operative facts to support the claim of negligence raised in the complaint. In his complaint, Feldman raised one count of negligence against, inter alia, VBC based upon its numerous failings relative to the tree removal. **See** Amended Complaint, Count II. The evidence presented at trial supported this claim. Whether the tree removal was part of the Kelly (as Feldman originally believed) or a separate project (as discovery later revealed) did not change the legal landscape for VBC, as the pleadings and evidence all were based upon Feldman's injuries sustained during the tree removal and VBC's failure to take appropriate precautions. VBC therefore was clearly not prejudiced by this change in fact—indeed, VBC makes no claim of prejudice in its argument before this Court. **See Reynolds**, 676 A.2d at 1210; **see generally** VBC's Brief at 50-54. As such, we decline to find that there was a material variance between the pleadings and the evidence at trial and conclude that the trial court did not err or abuse its discretion by denying VBC's request for JNOV on this basis.

## Workers' Compensation Act

VBC further asserts that JNOV was warranted as a matter of law based upon either section 302(a) or section 302(b) of the Workers' Compensation Act ("WCA"), both of which fall under what is commonly referred to as the

Statutory Employer Doctrine.[7]  *See McDonald v. Levinson Steel Co.*, 153 A. 424, 425 (Pa. 1930) ("A statutory employer is a master who is not a contractual or common-law one, but is made one by the [WCA].").  The WCA requires employers to pay workers' compensation benefits to employees injured during the course of employment regardless of the employer's negligence.  *See* 77 P.S. § 431;[8] *Dobransky v. EQT Production Co.*, 273 A.3d 1133, 1134 (Pa. Super. 2022) (en banc).  The idea behind the Statutory Employer Doctrine is to eliminate the possibility of giving a contractor a "free walk" if the contractor fails to ensure that a subcontractor s/he hired has the statutorily mandated WCA insurance[9] by holding the contractor responsible for the payment to the injured employee of a subcontractor should the subcontractor fail to pay.  *Six L's Packing Co. v. W.C.A.B. (Williamson)*, 44 A.3d 1148, 1154 (Pa. 2012) (citation omitted).

If either section 302(a) or (b) is applicable, a statutory employer "is immune from suit by an injured worker for common law negligence," regardless of whether the subcontractor carried workers' compensation

---

[7] Act of June 2, 1915 P.L. 736, No. 338, art. III, § 302, as amended, 77 P.S. §§ 461, 462.

[8]  Act of June 2, 1915 P.L. 736, No. 338, art. III, § 301(a), as amended, 77 P.S. § 431.

[9]  Pursuant to section 302(d) of the WCA, "A contractor shall not subcontract all or any part of a contract unless the subcontractor has presented proof of insurance under this act."  77 P.S. § 462.1.

insurance that paid the injured worker. *Fonner v. Shandon, Inc.*, 724 A.2d 903, 904 (Pa. 1999). This is because the WCA treats a statutory employer as if it is the actual employer, who is likewise immune from suit brought by the employee for a work-related injury. *See Dobransky*, 273 A.3d at 1135 (explaining that this immunity comes "in return for assuming secondary liability for the payment of workers' compensation benefits").[10] As the provisions implicate subject matter jurisdiction, the question of their applicability is not waivable; "it may be raised at any stage in the proceedings by the parties or by a court on its own motion." *In re Petition for Enf't of Subpoenas issued by Hearing Exam'r in a Proceeding before Bd. of Med.*, 214 A.3d 660, 663 n.3 (Pa. 2019) (citation and brackets omitted); *LeFlar v. Gulf Creek Indus. Park No. 2*, 515 A.2d 875, 879 (Pa. 1986) ("the [WCA] deprives the common pleas courts of jurisdiction of common law actions in tort for negligence against employers and is not an affirmative defense which may be waived if not timely plead").

### Section 302(a)

Section 302(a) of the WCA provides:

A contractor who subcontracts all or any part of a contract and his insurer shall be liable for the payment of compensation to the employes of the subcontractor unless the subcontractor primarily

---

[10] We note there have been numerous calls in various court decisions for the General Assembly to eliminate statutory employer immunity in the absence of payment of workers' compensation benefits to the injured worker. *See, e.g., Dobransky*, 273 A.3d at 1141-42 (quoting *Doman v. Atlas America, Inc.*, 150 A.3d 103, 109-10 (Pa. Super. 2016) (collecting cases)).

liable for the payment of such compensation has secured its payment as provided for in this act. Any contractor or his insurer who shall become liable hereunder for such compensation may recover the amount thereof paid and any necessary expenses from the subcontractor primarily liable therefor.

For purposes of this subsection, a person who contracts with another (1) to have work performed consisting of (i) the removal, excavation or drilling of soil, rock or minerals, or (ii) the cutting or removal of timber from lands, or (2) to have work performed of a kind which is a regular or recurrent part of the business, occupation, profession or trade of such person shall be deemed a contractor, and such other person a subcontractor. This subsection shall not apply, however, to an owner or lessee of land principally used for agriculture who is not a covered employer under this act and who contracts for the removal of timber from such land.

77 P.S. § 461. As our Supreme Court has explained, section 302(a) applies to the specialty contracts identified (including, in relevant part, contracts for "the cutting or removal of timber from lands"), but also to those that constitute "work of a kind which is a 'regular or recurrent part of the business' of the putative statutory employer." **Williamson**, 44 A.3d at 1157 (citing 77 P.S. § 461).

The trial court discussed this provision, sua sponte, in its opinion filed pursuant to Pa.R.A.P. 1925(a). **See** Trial Court Opinion, 8/22/2023, at 14. Though the court believed that the work performed by Colonial was "the cutting or removal of timber from lands," it found that section 302(a) was nonetheless inapplicable because there was no proof of a contract between VBC and Colonial. **Id.** As there can be no statutory employer status unless

"a person … contracts with another" for the identified work, it found VBC was not entitled to immunity under section 302(a). *Id.*

VBC contends that this was error, as it clearly had a contract with Colonial, albeit an oral contract, based upon the acknowledgement of Bruce Ross, owner of Colonial, during his testimony that he "had an agreement with Vito Braccia's company" to perform the tree removal work for an identified price.[11]  VBC's Brief at 48-49.  In VBC's view, this testimony, along with what VBC contends is an "undisputed fact" that the work performed was "the cutting or removal of timber from lands,"[12] requires a finding that VBC was Feldman's statutory employer under section 302(a).  *Id.* at 49.

Contrary to VBC's contention that the work performed by Colonial was undisputedly "the cutting or removal of timber from lands," we find the question of what constitutes "timber" under subsection 302(a)(1)(ii) to be ambiguous, making it unclear as to whether the provision applies to the circumstances before us.  Our review of the WCA reveals that it does not

_____

[11]  VBC does not contend, and the record does not support a finding, that the tree removal service engaged in by Colonial was a regular or recurrent part of its business, and we therefore do not evaluate the applicability of that aspect of the statute.

[12]  We note that this "fact" is disputed by Feldman.  *See* Feldman's Brief at 47-48.  Because the trial court sua sponte raised the question of the applicability of section 302(a) in its Rule 1925(a) opinion, and VBC asserts its applicability for the first time in its brief before this Court, Feldman's first opportunity to voice his opposition to the application of section 302(a) was in his responsive brief.

contain a definition of "timber." To determine the meaning of this language we therefore turn to our principles of statutory construction, which instruct that we must endeavor to "ascertain and effectuate the intention of the General Assembly" when enacting section 302(a)(1)(ii). 1 Pa.C.S. § 1921(a). Although the plain language of the statute is the best indicator of legislative intent, if the statutory language is ambiguous (as it is here), we may explore other avenues to discern its meaning, including, inter alia, the object to be attained, the mischief to be remedied, and the consequences of a particular interpretation. *Id.* § 1921(b), (c). In reaching this determination, we may look to "other statutes upon the same or similar subjects." *Id.* § 1921(c)(5).

Our research reveals that section 8311 of the Judicial Code,[13] which addresses damages in actions for the conversion of timber, does contain a definition of "timber." *See* 42 Pa.C.S. § 8311(c); *see also Miller v. Cnty. Of Ctr.*, 173 A.3d 1162, 1170 n.7 (Pa. 2017) (our Supreme Court, collecting cases, observing that "courts routinely invoke the definitions provided in the Judicial Code" when interpreting statutes in other provisions that contain undefined terms). In fact, it is the only statute to define the term. As in *Miller*, "this is a case where we are left with no other source for determining the meaning of the undefined statutory term. … Under such circumstances,

_____

[13] 42 Pa.C.S. §§ 101-9914.

- 18 -

nothing precludes a court from considering the definitions provided in the Judicial Code[.]" *Id.*

Section 8311 applies to a party "who cuts or removes the timber of another person without the consent of that person," and sets forth the exclusive civil remedies upon a finding of liability. 42 Pa.C.S. § 8311(a). The statute defines "timber" as "standing trees, logs or parts of trees that are commonly merchandized as wood products." *Id.* § 8311(c).

In applying section 8311, this Court has distinguished the cutting of timber from otherwise felling trees according to the purpose of the trees when they are standing. *See Christian v. Yanoviak*, 945 A.2d 220 (Pa. Super. 2008). In *Christian*, the appellant cut several trees on located on appellees' adjacent property that were shielding the appellees' home from view of the Pennsylvania Turnpike, and "[t]he trees were sold for timber." *Id.* at 223. The appellees sought damages in the amount of the replacement value of the trees, the cost to restore their property to its original condition, and the profit the appellant yielded from selling their trees. *Id.* The appellant, on the other hand, advocated for damages in the amount of the cash value of the trees pursuant to section 8311. *Id.* The trial court agreed with the appellees, finding section 8311 inapplicable; the appellant appealed, and we affirmed. *Id.* at 226.

Of particular relevance here, the *Christian* Court found that "the trees at issue do not constitute 'timber' as defined under the statute since they were

not intended to be harvested for commercial use." Further, we found that nothing in section 8311(c)'s definition implies that residential backyard trees are to be included as timber. *Id.* Instead, "the trees were situated in [the a]ppellees' yard solely for purposes of decoration, providing shade as well as serving as a natural sound and visual barrier between the home and the Pennsylvania Turnpike." *Id.*

Consistent with the definition provided in section 8311, our laws are replete with references to "timber" as a thing of value and something separate and distinguishable from mere trees. *See, e.g.,* 18 Pa.C.S. § 1107 (addressing restitution for theft of timber); Act of 1905, April 20, P.L. 246, § 1, 72 P.S. § 5583 (providing tax incentive for the planting of forest trees or timber trees); Act of May 13, 1925 P.L. 643, 32 P.S. Part I, Ch. 8 (entitled "Trees, Timber and Lumber"). Additionally, the lone case addressing section 302(a)(1)(ii), *Dalich v. W.C.A.B. (Lyons)*, 661 A.2d 936 (Pa. Commw. 1995), decided by the Commonwealth Court, likewise supports the applicability of section 8311's definition of "timber."[14] *See id.* at 936-38

_____

[14] Although we are not bound by decisions of the Commonwealth Court, "such decisions provide persuasive authority, and we may turn to our colleagues on the Commonwealth Court for guidance when appropriate." *Petow v. Warehime*, 996 A.2d 1083, 1089 (Pa. Super. 2010) (citation omitted). This is particularly true where, as here, the statutory scheme in question is more commonly evaluated by the Commonwealth Court. *See* 42 Pa.C.S. §§ 762(a)(3), 763(a) (directing appellate jurisdiction of the Commonwealth Court of appeals from administrative agencies).

(though not the focus of the decision, stating that the contract in question was for the cutting or removal of timber from land where the injured worker's employer contracted a commercial hardwood business to harvest timber the owner purchased).[15]

Here, the project in question was for the removal of trees located on adjacent properties which obstructed the view from the Kelly. N.T., 3/30/2021 (Blumenfeld Deposition), at 28-29, 50; N.T., 4/21/2021 (Gallagher Deposition), at 34. The trees were of the type that dot an urban landscape, possibly as a visual or sound barrier between properties, and, based on the evidence presented, were dead or dying at the time Colonial was set to remove them. **See** N.T., 4/21/2021 (Gallagher Deposition), at 36 (indicating that the Lower Merion arborist came to view the trees and concluded they were fine to be taken down as "they weren't viable"); **see also, e.g.,** Feldman Exhibits P-50C, P-50E, P-50F, P-62, P-77E, P-77F, P-78, P-113, P-128. VBC does not claim, and the record does not support a finding, that the trees had any value

_____

[15] In **Lyons**, Dalich was injured while working, but not as a result of negligence, and his actual employer, Robert Stock, did not carry workers' compensation insurance as required by the WCA. **Lyons**, 661 A.2d at 937. The central issue involved in **Lyons** was whether section 302(a) of the WCA required that the alleged statutory employer occupy or control the premises where the injury occurred, as is required for a finding under section 302(b). **Id.** at 938. The **Lyons** Court held that there was no such requirement under the law, **id.** at 939, a decision our Supreme Court later confirmed was correct in **Williamson**. **See Williamson**, 44 A.3d at 1157.

whatsoever or were "intended to be harvested for commercial use." ***See***

***Christian***, 945 A.2d at 226.

As the trees in question were not "timber," we conclude that section

302(a) of the Workers Compensation Act does not apply to the tree removal

work performed. VBC therefore cannot be deemed a statutory employer under

section 302(a)(1)(ii).[16]

*Section 302(b)*

Section 302(b) addresses the far more common use of the Statutory

Employer Doctrine. That provision states, in pertinent part:

> Any employer who permits the entry upon premises occupied by
> him or under his control of a laborer or an assistant hired by an
> employe or contractor, for the performance upon such premises
> of a part of such employer's regular business entrusted to that
> employe or contractor, shall be liable for the payment of
> compensation to such laborer or assistant unless such hiring
> employe or contractor, if primarily liable for the payment of such
> compensation, has secured the payment thereof as provided for
> in this act. Any employer or his insurer who shall become liable
> hereunder for such compensation may recover the amount thereof
> paid and any necessary expenses from another person if the latter
> is primarily liable therefor.

77 P.S. § 462. The long-adhered to test for determining whether a person or

entity constitutes a statutory employer under section 302(b) was originally set

forth by our Supreme Court in ***McDonald v. Levinson Steel Co.***, 153 A. 424

---

[16] While this is not the reason for the trial court's decision below, the law is clear that "we may affirm a trial court's ruling on any basis supported by the record on appeal." ***Lynn v. Nationwide Ins. Co.***, 70 A.3d 814, 823 (Pa. Super. 2013).

(Pa. 1930). The **McDonald** test requires proof of each of the following elements to satisfy section 302(b):

> (1) An employer who is under contract with an owner or one in the position of an owner. (2) Premises occupied by or under the control of such employer. (3) A subcontract made by such employer. (4) Part of the employer's regular business intrusted [sic] to such subcontractor. (5) An employee of such subcontractor.

*Id.* at 426.

Section 302(b) is remedial in nature, as the General Assembly wanted to ensure that injured workers received workers' compensation benefits despite the default of the subcontractor employer. *Patton v. Worthington Assocs., Inc.*, 89 A.3d 643, 645 (Pa. 2014) (citing *Qualp v. James Stewart Co.*, 109 A. 780, 782 (Pa. 1920)). Therefore, we have required strict construction of the *McDonald* factors to ensure that the Statutory Employer Doctrine, and the resultant immunity provided to contractors, is not "converted into a shield behind which negligent employers may seek refuge." *Travaglia v. C.H. Schwertner & Son, Inc.*, 570 A.2d 513, 515 (Pa. Super. 1989) (citations omitted); *accord Peck v. Delaware Cnty. Bd. of Prison Inspectors*, 814 A.2d 185, 189 (Pa. 2002) (OAJC) ("In determining whether a party is a statutory employer, courts should construe the elements of the *McDonald* test strictly and find statutory employer status only when the facts clearly warrant it.").

Applying the above standard and test, the trial court found that VBC failed to establish that it met elements one, three, four, and five of the

*McDonald* test. Trial Court Opinion, 8/22/2023, at 7. Specifically, it found there was no evidence that VBC (the undisputed contractor for the tree removal) and Cross Properties (purportedly the owner or one in the position of the owner) entered into a contract, as the testimony at trial conclusively established that the representatives of Cross Properties (Mr. Blumenfeld and Mr. Gallagher) believed they were contracting with Altino, not VBC. *Id.* at 8. "Accordingly, as an essential element of a purported contract—the parties['] mutual understanding of with whom they were contracting—was missing, VBC and Cross Properties never had a meeting of the minds and a contract was not established." *Id.* at 9. For similar reasons, the trial court found no subcontract existed between VBC and Colonial, as Mr. Ross indicated his understanding at trial that he was contracting with Altino, for whom he had previously conducted tree removal projects. *Id.* at 10 (citing N.T. 134:15-135:13, 177:10-178:1, 190:16-19, October 25, 2022).

Additionally, the trial court found that there was no contract with an owner or one in the position of the owner, as the tree removed that resulted in Feldman's injuries was on property owned by SEPTA. *Id.* at 9. "During trial, Mr. Braccia stated that he never contacted anyone at SEPTA for a right of entry to this property. (N.T. 34:9-22, October 27, 2022.) Therefore, there could not have been an agreement between VBC and the owner of the property upon which those trees were located," and VBC failed to satisfy the first *McDonald* element on that basis as well. *Id.* at 9-10.

VBC addresses only the trial court's findings as it relates to the absence of a contract between VBC and Cross Properties and the absence of a subcontract between VBC and Colonial (as well as advancing a protective argument in support of finding that the second **McDonald** element was satisfied). **See** VBC's Brief at 21-47. VBC goes to great lengths to delineate the testimony supporting its claim—in particular, testimony from various witnesses involved in the tree removal project that "Vito Braccia" or "Vito Braccia's companies" were to do the job. **See id.** VBC also identifies testimony provided by Feldman's experts indicating that Cross Properties retained VBC to do the tree removal work. **Id.** at 28-29 (citing N.T., 10/25/2022, at 102, 107-08 (testimony from Dr. Vigilante that Mr. Braccia "was hired to hire Colonial and direct the project" and VBC "was responsible" for the tree removal project), and **id.** at 54-55, 60, 61 (Mr. Randle testifying that Cross Properties reached out to VBC for the tree removal project, that VBC was the general and controlling contractor for the tree removal, and that VBC was responsible to manage the work and safety of the site)).

This does not, however, establish that VBC was the entity contracted with for the tree removal project. To the contrary, the two individuals from Cross Properties responsible for the tree removal project, Mr. Blumenfeld and Mr. Gallagher, each clearly testified that Altino was the entity retained for the tree removal job. Mr. Blumenfeld testified that he had never heard of VBC before, had only worked with Altino, and until the time of his deposition, never

knew VBC had any involvement in the tree removal project. N.T., 3/30/2021 (Mr. Blumenfeld Deposition), at 72, 131. Mr. Gallagher testified that he contracted with Altino for the tree removal project. N.T., 4/21/2021 (Mr. Gallagher Deposition), at 72. In fact, he testified that he was aware that Colonial was going to be doing the tree removal work, not Altino, and when asked why he did not simply contract with Colonial directly, he responded that it was "[b]ecause we had a long-standing relationship with Altino." *Id.* at 73; *see also id.* at 137-38 (agreeing in his testimony that, for the tree removal project, Mr. Gallagher believed he was "dealing with Vito Braccia as a representative of Altino"); *id.* at 138, 141 (Mr. Gallagher testifying that although he considered "Vito and his various companies" to be "the same," he did not believe that VBC was involved in the tree removal project). This is all supported by the estimate and emails sent about the tree removal project, which indicated they were from Mr. Braccia on behalf of Altino. *See, e.g.,* Feldman's Exhibit P-79; Altino Motion for Summary Judgment, 2/7/2022, at Exhibit N. Mr. Braccia, however, very clearly and consistently testified that Altino played no role in the direction and management of the tree removal project, admitting that VBC was the only company of his involved in that aspect of the project. *See* N.T., 10/27/2022, at 16; N.T., 10/25/2022, at 68.

As our High Court has recognized, a person or entity is free to conduct business using a corporate form, but "[o]nce these choices are made, such persons and entities are not free to blur the lines of the capacity in which they

act as it may suit them, and the courts must take care to maintain the necessary distinctions." ***Patton***, 89 A.3d at 649. Tellingly, throughout both depositions, counsel for VBC repeatedly objected and/or clarified that Mr. Braccia, VBC, and Altino were distinct legal entities, with VBC and Altino being different companies. ***See, e.g.,*** N.T., 3/30/2021 (Mr. Blumenfeld Deposition), at 129; N.T., 4/21/2021 (Mr. Gallagher Deposition), at 74, 136. Therefore, viewing the record in the light most favorable to Feldman as the verdict winner, we find no error or abuse of discretion in the trial court's conclusion that there was insufficient evidence of a contract between VBC and the Cross Property entities for the tree removal project and denying VBC's request for JNOV on this basis. ***See Doe***, 987 at 764; ***Holt***, 932 A.2d at 919.

Even assuming that there was a valid contract between VBC and any of the Cross Properties entities for the tree removal, we agree with the trial court that there is no evidence that VBC contracted with "an owner or one in the position of an owner." A contractor occupies the position of the owner by conducting work under contract with the owner of the property whereby they occupy and control the premises and are authorized to permit subcontractors to enter the property. ***McCarthy v. Dan Lepore & Sons Co.***, 724 A.2d 938, 942 n.3 (Pa. Super. 1998) (citation omitted).

In the matter before us, Cross Properties requested that Mr. Braccia remove trees on the neighboring property to allow for an unobstructed view of the city from the Kelly. ***See*** N.T., 3/30/2021 (Mr. Blumenfeld Deposition),

at 28-29, 50; N.T., 4/21/2021 (Mr. Gallagher Deposition), at 34. Some of the trees were located on 29 Bala Avenue; others, including the tree that is at the center of this case, were located on property owned by SEPTA. N.T., 10/26/2022, at 18-19; Feldman's Exhibit P-113. The record reflects, however, that no entity associated with the tree removal project obtained SEPTA's permission to enter upon its property and remove the tree that resulted in Feldman's injuries.[17] N.T., 10/26/2024, at 19-20.

Mr. Blumenfeld testified that he never met with SEPTA about the tree work or to obtain permission to enter. N.T., 3/30/2021 (Mr. Blumenfeld Deposition), at 65. Mr. Gallagher likewise did not notify SEPTA or seek permission to allow VBC to conduct the tree removal on its property. N.T., 4/21/2021 (Mr. Gallagher Deposition), at 66, 105-06. Mr. Gallagher did have staff contact PECO about potentially trimming the tree in question, but PECO responded that it did not do this work; instead, the contractor needed "to fill out a make-safe form. PECO would then come out and assess the situation to see if the lines need to be de-energized for the day." *Id.* at 107-08; *see also id.* at 149-50 (Mr. Gallagher received confirmation that PECO lines ran through the trees to be removed). This did not occur. *Id.* at 129-30, 150-51.

_____

[17] The parties stipulated that the tree in question was removed from SEPTA's property. N.T., 10/27/2022, at 122. *See also* N.T., 3/30/2021 (Mr. Blumenfeld Deposition), at 52 ("Where this [tree removal] work happened was offsite, it wasn't on our property.").

Mr. Braccia testified that he was aware the tree in question was on SEPTA's property, but he did not contact SEPTA to seek permission to enter its property (though he recognized that he should have and that it was his responsibility to do so). *See* N.T., 10/27/2022, at 34, 37-39. David Montvydas, SEPTA's chief engineer of its maintenance department, testified that there is a mandatory application process for any person or entity seeking right of entry onto SEPTA's property. N.T., 10/26/2024, at 5-9. He confirmed that neither Mr. Braccia, VBC as an entity, nor any representative of Cross Properties contacted SEPTA, let alone complied with its right of entry process, for the tree removal project. *Id.* at 19-20, 24. VBC did not have permission to enter SEPTA's property or to remove the tree from its property. *Id.*

There was no contract with SEPTA, the owner of the property, nor was VBC authorized to permit subcontractors to enter upon SEPTA's property. On this basis, VBC fails to satisfy the first element of the *McDonald* test, as he did not have a contract with the owner of the property or someone in the position of the owner of the property in question. *See McCarthy*, 724 A.2d at 942 n.3. We therefore find no error or abuse of discretion by the trial court in finding that VBC was not Feldman's statutory employer pursuant to section 302(b). VBC's argument that it was entitled to JNOV also fails on this basis.

### New Trial – Statutory Employer

In the alternative, VBC contends that it is entitled to a new trial at which its status as a statutory employer can be litigated—in particular, the question

of whether VBC had a contract with Cross Properties for the tree removal work. VBC's Brief at 49-50. Assuming solely for the sake of this argument that the applicability of the Statutory Employer Doctrine could be a jury question, we find that VBC is not entitled to a new trial on this basis. Because VBC failed to establish that the work involved the "cutting or removal of timber from lands" or that VBC was permitted to be on SEPTA's property, there is no reason to remand the matter for a new trial to litigate the question of whether VBC had a contract with the Cross Properties entities.

## **Weight of the Evidence**

In its penultimate issue, VBC contends that the jury's verdict finding VBC 100% liable for Feldman's injuries was against the weight of the evidence.[18] VBC's Brief at 54-56. Specifically, VBC argues that the evidence presented reflected that Cross Properties and Altino each violated its standard of care, created an unreasonably dangerous situation by failing to plan and properly oversee the tree removal project, and was responsible for Feldman's injuries. *Id.* at 55-56. According to VBC, this evidence was "uncontroverted." *Id.* at 56.

---

[18] In addition to questions concerning VBC's negligence, the jury form included separate questions of whether Altino or any of the Cross Property entities named as defendants were liable and provided the jury a space to apportion the percentage of liability between VBC and those defendants. *See* Verdict Sheet at 1-3.

The trial court found that the evidence presented supported the jury's finding that VBC was 100% liable for Feldman's injuries. There was no testimony that any of the individual defendants, collectively referred to as Cross Properties,[19] participated in the tree removal project. Trial Court Opinion, 8/22/2023, at 21. Indeed, as the court observed, Blumenfeld testified that none of the Cross Properties named defendants had any employees. *Id.*

According to the trial court, the only individuals associated with Cross Properties that had any involvement in the tree removal project were Mr. Blumenfeld and Mr. Gallagher; the record, however, was unclear as to who Mr. Blumenfeld worked for, and neither Mr. Blumenfeld, Mr. Gallagher, nor Mr. Gallagher's employer (Cross Prop. P&B, LLC) were named as defendants in this case or included on the jury verdict slip. *Id.* at 21-22. Further, the court found the record amply supported the jury's finding that Altino was not responsible for Feldman's injuries, including testimony from Mr. Braccia that Altino was not involved in the tree removal project. *Id.* at 22. The trial court therefore found that the jury's verdict holding VBC 100% responsible for Feldman's injuries was supported by the record, did not shock its sense of justice, and therefore was not against the weight of the evidence. *Id.* at 23.

_____

[19] *See supra*, note 1.

"Appellate review of a weight claim is a review of the trial court's exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence." *McFeeley v. Shah*, 226 A.3d 582, 594 (Pa. Super. 2020) (internal brackets and citation omitted). "Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence." *Bartlett v. Demich*, 307 A.3d 736, 741 (Pa. Super. 2023) (citation omitted). "One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice." *McFeeley*, 226 A.2d at 594 (citation omitted).

> If there is any support in the record for the trial court's decision to deny the appellant's motion for a new trial based on weight of the evidence, then we must affirm. An appellant is not entitled to a new trial where the evidence presented was conflicting and the factfinder could have decided in favor of either party.

*Id.* (cleaned up; citation omitted).

After carefully reviewing the evidence of record, we find that it fully supports the trial court's findings and conclusions. VBC is correct that the record contains evidence that two of Feldman's expert witnesses, William Vigilante (expert in human factors and ergonomics) and Jason Randle (expert in worksite safety on construction sites) included in their reports information

to support a general finding that "Cross Properties" was negligent. N.T., 10/25/2022, at 110-12; 10/26/2022, at 90-91. VBC also correctly states that Dr. Vigilante included in his report information and conclusions that could support a finding of Altino's negligence. N.T., 10/25/2022, at 110-12. Dr. Vigilante explained, however, that he had "lumped [together VBC and Altino] in with the acronym ACC," and that after writing his report, he learned that Altino was not involved in the tree removal project. *Id.* at 112-13; *see also id.* at 68 (relying upon Mr. Braccia's deposition testimony that no Altino employees were involved in the tree removal project, only VBC).

The record further reflects that both Dr. Vigilante and Mr. Randle testified, in no uncertain terms, that VBC's negligence alone was the cause of Feldman's injuries. *Id.* at 81-86, 96-97, 99; N.T., 10/26/2022, at 60-63, 68-76.[20] This is supported by admissions made in the testimony of Mr. Braccia himself:

- Mr. Braccia knew that it was his responsibility to make the tree removal jobsite safe and that he failed to live up to that responsibility. N.T., 10/27/2022, at 13.

---

[20] Mr. Randle testified to the existence of joint responsibility for jobsite safety between VBC and Colonial. N.T., 10/26/2022, at 85. As Colonial is Feldman's employer, however, it could not be held liable under a theory of negligence. *See* 77 P.S. § 431.

- As he was responsible for jobsite safety, he made a promise that he would plan, supervise, and manage in a way that kept workers safe, but he failed to keep that promise. ***Id.*** at 53.

- He knew the tree in question was located on SEPTA's property, that there were power lines above the trees to be removed, that it was his responsibility to contact SEPTA to request right of entry, and that his failure to do so was his mistake. ***Id.*** at 34, 37-39.

- He did not engage in any planning with Mr. Gallagher or anyone from Cross Properties; Mr. Braccia knew any planning needed to be done himself and he failed to do so. ***Id.*** at 50-51.

Based upon the evidence presented, we find no abuse of discretion in the trial court's determination that the verdict was not against the weight of the evidence. VBC is not entitled to a new trial on this basis.

### Photographic Evidence

Lastly, VBC asserts that the trial court abused its discretion by admitting photographic evidence of Feldman's injuries that VBC contends were "extremely gruesome and graphic." VBC's Brief at 56 (citing Feldman's Exhibits P-85–P-90, P-92–P-93, P-95–96). According to VBC, the trial court should have excluded these photographs pursuant to Pennsylvania Rule of Evidence 403, which provides for the exclusion of otherwise relevant evidence if the probative value of the evidence is outweighed by the danger for unfair prejudice or is needlessly cumulative of other evidence already admitted. ***Id.***

at 57 (citing Pa.R.E. 403). VBC argues that the photographs in question were "inflammatory," used to "shock the conscious of the jury and engender sympathy" for Feldman, and "completely unnecessary" because Feldman's medical expert also utilized medical illustrations to explain some of the procedures Feldman underwent following his injuries. *Id.*

The trial court provided the following explanation for its admission of the photographs:

> [Feldman] proffered several photographs which showed the injuries he sustained from his electrocution. The photographs were taken on different days and show different stages in [Feldman's] recovery process including the various procedures he underwent, such as a laparotomy, debridement procedures, grafting, and bandage changing. While the photographs are graphic, they are an accurate representation of [] Feldman's injuries. They bear directly on the pain and suffering that he has been forced to endure. Dr. William Hughes, [Feldman's] burn expert and the surgeon who conducted the procedures on [] Feldman, utilized the photographs during his testimony to make his description of the injuries and procedures and the illustrations provided more intelligible for the jury. These injuries and procedures are not something the average juror has seen, and the images allow them to more fully comprehend what happened to [] Feldman. Although the photographs may have been unpleasant, they were clearly relevant to the issue of damages.
>
> Further, these images were neither duplicative nor cumulative such that they would prejudice [VBC]. [Feldman] moved into evidence only ten photographs of [] Feldman's injuries. These photographs were from different days and different phases in [] Feldman's recovery. [Feldman] did not pile on repetitive photographs and the jury was not overwhelmed with duplicative and repetitive photos. It was merely shown what was necessary to convey the severity of [] Feldman's injuries. Moreover, these photographs were not cumulative to the testimony. As such, this [c]ourt determined the risk of prejudice was not so great that it outweighed the clear probative value of the photographs.

Trial Court Opinion, 8/22/2023, at 24-25 (footnote omitted).

We review claims challenging the admission of evidence for an abuse of discretion. *Stumpf v. Nye*, 950 A.2d 1032 (Pa. Super. 2008). An abuse of discretion requires more than finding an error of judgment or that this Court would have ruled differently; instead, discretion is abused "if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record[.]" *Id.* (citation omitted).

> Merely because a photograph is gruesome is not a reason to exclude it. The court must consider whether the evidentiary value of the photograph outweighs the danger that it will upset the jury. Even when a witness has described an injury, a photograph may still have evidentiary value in that it may make the description more intelligible.

*Cervone v. Reading*, 538 A.2d 16, 20 (Pa. Super. 1988) (internal citations omitted).

In explaining its reasoning, the trial court relied upon our prior decision in *Piso v. Weirton Steel Co.*, 345 A.2d 728 (Pa. Super. 1975) (en banc). *Piso* involved a question of the admissibility of photographs of an injured plaintiff who, because of the defendant's negligence, was electrocuted and sustained burns to thirty-five percent of his body. *Id.* at 730. The defendant challenged the trial court's admission of photographs depicting Piso's injuries and wounds, which accompanied the testimony of Dr. Harrison, Piso's treating physician in the burn unit of the hospital, and were used to explain the nature

and the extent of his injuries and treatment. This Court held that while the pictures "depict an unpleasant spectacle," the trial court did not abuse its discretion by admitting them, as "the pictures were clearly relevant to explain the nature and extent of the injuries and to illustrate the extensive treatment required." *Id.* at 731.

We agree with the trial court that *Piso* supports its decision to allow the admission of the photographs. The record reflects that counsel for Feldman culled through approximately 150 photographs, choosing 10, which amounted to 1 picture to depict each stage of Feldman's treatment. N.T., 10/24/2022, at 3-5. Counsel's argument in favor of admission was that the jury would not be able to fully understand Feldman's injuries and the kind of treatment he underwent without the photographs. *Id.* at 4.

We have reviewed the photographs in question, and although they are certainly not pleasant to view, they do nothing more than aid Dr. Hughes in his testimony about the medical procedures and treatment Feldman had to undergo for his injuries. *See id.* at 119-29; Feldman's Exhibits P-85–P-90, P-92–P-93, P-95–96. VBC is correct that Feldman also used medical illustrations—cartoon-like depictions of certain medical procedures that Feldman underwent— during his testimony, but we disagree that these slides rendered cumulative the photographs of Feldman throughout his medical journey. *See* VBC's Brief at 57 (citing Feldman's Exhibits P52–P-57). Our review of the exhibits, as well as the testimony that accompanied them, reveal

that those illustrative exhibits provided a basis for a general explanation of the procedure employed, while those that had a corresponding real-life photograph of Feldman[21] allowed Dr. Hughes to more fully explain Feldman's specific experience with the procedure. **Compare, e.g.,** N.T., 10/24/2022, at 117-10 (using Exhibit 53 to explain the mechanics of debridement, which uses a single-edge razor to remove dead tissue caused by the burn to allow for the grafting of skin to healthy tissue), **with id.** at 120-21 (using Exhibit 88 to show areas on Feldman's body after debridement, identifying tissue that was partially viable and areas that had received skin grafts post-debridement and were in the process of healing).

The photographs in question were relevant to illustrate the various and extensive treatments Feldman had to undergo and helped to make Dr. Hughes' testimony "more intelligible." **See Cervone**, 538 A.2d at 20; **Piso**, 345 A.2d at 731. They were neither cumulative nor unduly prejudicial when compared to their high probative value. **See** Pa.R.E. 403. We therefore find no abuse of discretion in the trial court's decision to allow the admission of the photographs.

## Conclusion

---

[21] At least one of the exhibits, P-57, which depicts the insertion of a Foley Catheter through a man's penis and into his bladder, had no accompanying real-life photograph of Feldman.

For the foregoing reasons, we find none of the issues raised by VBC on appeal warrant reversal of the trial court's denial of its motion for JNOV or remand for a new trial. We therefore affirm.

Judgment affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 9/12/2024