J-S03016-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: A.P.C.-D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: R.D., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1432 MDA 2025 |

Appeal from the Decree Entered September 15, 2025
In the Court of Common Pleas of York County Orphans' Court at No(s):
2025-0013a

| | | |
|---|---|---|
| IN RE: ADOPTION OF: A.J.C.-D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: R.D., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1433 MDA 2025 |

Appeal from the Decree Entered September 15, 2025
In the Court of Common Pleas of York County Orphans' Court at No(s):
2025-0014a

BEFORE:  DUBOW, J., BECK, J., and LANE, J.

MEMORANDUM BY BECK, J.:          **FILED: APRIL 13, 2026**

R.D. ("Father") appeals from the September 15, 2025 decrees granting the petitions filed by the York County Office of Children, Youth & Families ("CYF") to involuntarily terminate his parental rights to his son, A.J.C.-D. ("A.J."), born in September 2018, and daughter, A.P.C.-D. ("A.P."), born in

December 2020 (collectively, "Children").[1]  After careful review and consideration, we are compelled to reverse the decrees as unsupported by the record and applicable law.

**Facts and Procedural History**

We glean the available factual and procedural history of these cases from the certified record.[2]  CYF first received referrals regarding Children at

_____

[1]  On the same day, the orphans' court filed separate decrees that involuntarily terminated the parental rights of Children's biological mother, S.A.C. ("Mother") (collectively with Father, "Parents").  Mother did not directly participate in the subject termination proceedings, nor did she appeal the decrees that terminated her parental rights to Children.

[2]  The court records from the dependency proceedings pertaining to Children are absent from the certified record.  Although CYF relied upon these records in support of its request to terminate Father's parental rights to Children, it never moved the records themselves into evidence.  ***See*** N.T., 9/15/2025, at 100 ("I think the dependency record adequately addresses those issues and the concerns of the agency."); ***see also*** CYF's Proposed Factual Findings, 2/3/2025, ¶¶ 1-9; CYF's Amended Proposed Factual Findings, 4/10/2025, ¶¶ 1-10; CYF's Second Amended Proposed Factual Findings, 8/15/2025, ¶¶ 1-13 (all purporting to summarize aspects of the dependency proceedings).

The record reflects that at the request of CYF's counsel, the orphans' court took judicial notice of the court records from Children's dependency proceedings.  N.T., 9/15/2025, at 8; Orphans' Court Order, 9/15/2025.  It is well settled that "[a] court may not ordinarily take judicial notice in one case of the records of another case, whether in another court or its own, even though the contents of those records may be known to the court."  ***220 Partnership v. Philadelphia Elec. Co.***, 650 A.2d 1094, 1097 (Pa. Super. 1994) (citation and quotation marks omitted); ***see also, e.g., Interest of S.S.***, 252 A.3d 681, 688 (Pa. Super. 2021) ("Termination proceedings often occur simultaneously with dependency proceedings, but these two types of proceedings remain distinct, with their own docket numbers, records, and divisions within the Court of Common Pleas.").  Our case law suggests that "juvenile court records" do not constitute "adjudicative facts" for the purposes
*(Footnote Continued Next Page)*

the time of their respective births, although it is unclear what the motivating concerns were in those instances.[3] *See* N.T., 9/15/2025, at 28-29. It does not appear, however, that CYF offered services to the family in connection with these referrals. *Id.* (indicating vaguely that the referrals were "accepted for services" but only to "test [F]ather to see if there was any concerns for him," without further explanation). In March 2024, CYF received a General Protective Services ("GPS") report alleging that the family was residing in a home that was described as a "crack house." N.T., 9/15/2025, at 29. CYF subsequently learned, however, that the family was not living in the identified

_____

of judicial notice under the Pennsylvania Rules of Evidence. *In re T.B.*, 266 A.3d 609, at *7 (Pa. Super. 2021) (non-precedential decision) (citing Pa.R.E. 201(a)); *see also E.C.S. v. M.C.S.*, 256 A.3d 449, 456 n.3 (Pa. Super. 2021) (noting "non-precedential decisions filed after May 1, 2019, may be cited for their persuasive value"). We recognize that no party has objected to this erroneous procedure. There is also no obvious basis to raise such an evidentiary issue sua sponte. *See In re Smith*, 74 A.2d 131, 137 n.5 (Pa. Super. 2005). Our concern, however, does not pertain to the admissibility of this evidence, but, rather, its unavailability on appeal. *See T.B.*, at *8 (citing *S.S.*, 252 A.3d at 688) ("[T]his Court did not receive any portion of the juvenile record as part of the certified record on appeal. As a result, we cannot review the juvenile court record to confirm it supports . . . the decision of the orphans' court."). In adjudicating this appeal, we have relied only upon the competent evidence presented through witness testimony and admitted exhibits. *See In re K.P.*, 872 A.2d 1227, 1232 (Pa. Super. 2005) (observing it is inappropriate to accept, without corroboration, the "factual assertions set forth by a party" where there is no indication that the conclusions "were the products of the trial court's independent judgment"); *see also Feldman v. CP Acquisitions 25, L.P.*, 325 A.3d 691, 701 (Pa. Super. 2024) ("[S]tatements and arguments made by counsel do not constitute evidence. They are not the facts. [A]ny testimony of witnesses, documents, and other exhibits submitted during the trial constitute facts.") (cleaned up).

[3] The record is scarce and contains numerous information gaps.

residence. *See id.* at 29 (indicating that CYF "did not have concerns" regarding "inadequate housing" after meeting with the family in March 2024). There is no indication that CYF offered services or opened a formal case at that time, and the record reflects that CYF had no contact with the family for approximately two months. *See id.* at 29-30.

Around this time, Father suffered a series of catastrophic medical misfortunes. Approximately one year prior to CYF's receipt of the above GPS referral, Father's left leg was amputated for reasons that are not entirely clear from the record. *See id.* at 73, 82. He was hospitalized for "three to five months" and, as a result, the family was evicted because of their inability to pay the rent for this period of time. *See id.* at 82. This eviction appears to have been the beginning of Father's battles with housing insecurity which he has not been able to fully overcome.

In April 2024, Father developed an infection in his remaining leg. *Id.* at 73. During this time, Mother's whereabouts were unknown for a significant period, leaving Children in Father's sole care. *See id.* at 36. Father's health condition eventually worsened to the extent that he relocated with Children to the State of Delaware to be closer to the support of his extended family. *See id.* at 36-37, 73. In early May 2024, Father was hospitalized in Delaware and his right leg required amputation. *See id.* at 73-74, 76. He spent approximately two months in recovery facilities before being released to the care of his extended family in Delaware. *See id.*

As a consequence of Father's convalescence and Mother's unknown status, the Delaware Department of Services for Children, Youth and their Families ("DSCYF") assumed custody of Children. *See id.* at 29-30. It is unclear when they were removed, or when they were adjudicated dependent in Delaware. *See id.* at 34. Eventually, the case was transferred to Pennsylvania and CYF assumed custody of Children. *See id.* at 30. Since CYF's evidence did not document these events with specificity, we cannot verify the date of Children's removal, the basis for their dependency adjudication, or the circumstances under which Children were transferred to the Commonwealth's oversight.

The only documentation contained in the certified record regarding the ensuing dependency proceedings in Pennsylvania is an amended family service plan created by CYF in June 2024. *See generally* CYF Exhibit 1. From this document, we discern that Children's initial permanency goal was established as reunification. *See id.* at 4.[4] There is no mention in the family service plan of Father's hospitalization or his status as a bilateral amputee, i.e., the events that immediately precipitated Children's removal from his custody. The family service plan did note, however, that Children were "well

---

[4] Strangely, this document incorrectly indicates that Children came into CYF's custody as a result of the March 2024 housing referral, which, as noted above, was deemed unfounded. *See* CYF Exhibit 1 at 2. The plan is also not internally consistent as it indicates the family was accepted for services on May 17, 2024, i.e., approximately two months **after** CYF disposed of the March 2024 referral and, presumably, while Father remained hospitalized. *See id.* at 1.

bonded" with Father and that he showed appropriate "love and concern" for them. *Id.* at 1. This document reported that Father was still "addressing [his] health condition in order to be able to in the future care for [Children]." *Id.* at 1.

It is unclear what, if anything, Father was ordered by the juvenile court to do to achieve reunification. CYF's service plan provided that Father was to "cooperate" and "maintain open communication" with CYF. *Id.* at 8. The plan also indicated that Father needed to become "financially stable" by maintaining "employment or disability for stable income" and "suitable housing." *Id.* at 10. There was no competent evidence presented documenting the results of the permanency review hearings, which we presume occurred regularly, as required, in the juvenile court. Sometime after June 2024 and before February 2025, however, Children's permanency goal was changed to adoption. *See* N.T., 9/15/2025, at 61.

The history of Children's foster placements is also absent from the certified record. We are only able to ascertain that they lived in four different foster homes in the approximately fifteen months leading up to the termination hearing because of recurrent behavioral issues. *See id.* at 33. At some point, Children were placed into the care of J.T.-T. ("Foster Father"), who is identified as a preadoptive resource. *See* N.T., 9/15/2025, at 16-17, 22. It is unclear, however, how long Children had been in Foster Father's care at the time of the hearing.

Father struggled to return to Pennsylvania following the end of his hospitalization in Delaware. This was, in fact, the most prevalent concern identified by CYF's representatives. *See id.* at 30-31 ("[T]here was [sic] concerns that he was still in Delaware, that he wasn't coming to York County…. I would say the biggest thing is that he was still remaining in Delaware the entire time."). Despite his absence from York County, however Father consistently participated in supervised visits with Children through CYF and Pressley Ridge, which occurred over Zoom. *See id.* at 80.

While Father remained in Delaware, CYF declined to offer him any other supportive services to assist him with reunification. *See id.* at 31. The only evidence of record explaining the delay in Father's return to Pennsylvania came through Father, who indicated that his ability to return to Pennsylvania was adversely affected by his status as a bilateral amputee, which has impacted his ability to maintain employment, earn an income, and find housing.[5] *See id.* at 78 ("[W]ith these two legs that I got, I can't do what I used to do. And if I had my legs, we wouldn't be here today, I would promise you that."). Father began receiving Social Security Disability Insurance ("SSDI") income beginning in May 2024. *See id.* at 50.

---

[5] Father's former profession is not identified in the record. We gather, however, that he was regularly employed and able to provide for Children prior to the amputation of his legs. *See* N.T., 9/15/2025, at 80 ("I was a working man, I didn't have no amputations then. I worked every day.").

In January 2025, CYF submitted a request for Children to reside with Father in Delaware pursuant to the Interstate Compact for the Placement of Children ("ICPC"), which DSCYF denied based upon concerns Children would not have "private space" for sleeping in the home where Father was staying at that point, as Father's home did not have a separate room for each child.[6] *See* CYF Exhibit 2. Father reported to Delaware authorities that "he had nowhere else to go to have enough space for [Children]." *Id.* Father was not able to return to York County until April 2025. *See* N.T., 9/15/2025, at 57-58.

In the meantime, on February 3, 2025, CYF filed petitions seeking to terminate Father's parental rights to Children pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5) and (b) of the Adoption Act ("the Act").[7] At the initial

---

[6] These findings appear to be inconsistent with testimony presented at the hearing indicating that the home in question had "four bedrooms," a "furnished basement," and only two other occupants who were moving out. N.T., 9/15/2025, at 41.

[7] Our Supreme Court has instructed this Court to engage in "limited sua sponte review" to ensure that children are "afforded their statutory right to legal counsel when facing the potential termination of their parent's parental rights." *In re Adoption of K.M.G.*, 240 A.3d 1218, 1238 (Pa. 2020) (citing 23 Pa.C.S. § 2313(a)). On February 13, 2025, the orphans' court appointed Attorney Jason Shirey to serve as legal counsel for A.J. and, separately, appointed Attorney Sydney Benson to act as legal counsel for A.P. The court appointed Attorney Katherine Doucette to serve as Children's guardian ad litem to advocate for their best interests. *See* Order, 2/13/2025. Thus, the orphans' court complied with section 2313(a) of the Act. We also note that the court appointed a court-appointed special advocate ("CASA"), Attorney Janet Swaggert. *See* N.T., 6/13/2025, at 15-16.

termination hearing scheduled for April 24, 2025, however, the court continued the case after it was revealed that Father had not yet been appointed counsel. *See* N.T., 4/24/2025, at 3-5. On May 20, 2025, CYF filed an amended petition, which included a new request to also terminate Father's parental rights pursuant to section 2511(a)(8).

The rescheduled termination hearing took place on June 13, 2025, wherein counsel for Father and A.J. requested a continuance so that Father could properly engage with reunification services through CYF. *See* N.T., 6/13/2025, at 4 ("[Father] really only just began services and only had the benefit of counsel for about a month."). A.J.'s counsel also represented that his client was "adamant" and "desperately want[ed] to go home" with Father. *Id*. The court granted the request and continued the matter for three months. At this point, CYF referred Father to Pressley Ridge for housing and parent education services. *See* N.T., 9/15/2025, at 49-50.

During this brief interlude, Father was able to rent and furnish an "efficiency" apartment in York County. *See* N.T., 9/15/2025, at 50, 77. CYF declined to evaluate the appropriateness of the apartment or permit any home visits at this location. *See id.* at 52. There is no dispute that Father's apartment "does not allow for [C]hildren to have their own bedrooms" and also requires residents to utilize "shared bathroom space." *Id.* at 50. Father explained he was not "happy" with this arrangement, but that it was all he could afford in his current circumstances:

- 9 -

> I'm not happy here. I'm trying to – I'm basically trying to – ever since I've been here, I've been trying to find a place and – it's just ridiculous of what they want. And it's not their fault. I don't even think it's my fault. It's just you've got to have the last month, the security and the first month's rent. And I've been trying to save it, it's just – I just don't – it just take[s] time, I guess.

*Id.* at 77-78. To supplement his income, Father began a "car detailing business" that accepted cash payments, but this hampered his ability to provide acceptable verification of that income to CYF. *Id.* at 52, 57.

Ultimately, Father was unsuccessfully discharged from the Pressley Ridge programs in August 2025 for "lack of communication." *Id.* at 50. However, testimony presented by CYF suggests that Father's lack of communication with Pressley Ridge was connected to another period of hospitalization he experienced the same month. *See id.* at 69-70. No representative from Pressley Ridge testified, nor were any exhibits presented regarding Father's discharge from the program. Father continued to consistently participate in supervised visits with Children two times per week. *Id.* at 21-22. It is unclear whether any additional permanency review hearings occurred.

The court held a final termination hearing on September 15, 2025, at which time A.J. was approximately seven years old and A.P. was four years old. In pertinent part, CYF adduced testimony from CYF supervisor Stacey

Miller-Lewis, CYF caseworker Ashley Orwig, and Foster Father. Father was represented by counsel and testified on his own behalf by Zoom.[8]

As noted, the records from Children's dependency case were not admitted into the record. *See supra*, note 1. The only other evidence presented concerning Father, other than testimony, was the June 2024 family service plan, the January 2025 letter denying CYF's ICPC request to Delaware, and a summary regarding Father's supervised visits with Children that occurred prior to June 2025. *See* CYF Exhibits 1, 2, and 7.

At the conclusion of the hearing, the orphans' court ruled on the record that CYF had satisfied its burden pursuant to section 2511(a)(1), (2), (5), and (8). *See* N.T., 9/15/2025, at 101-03. The court, however, did not make any findings, or express any inclinations, regarding section 2511(b). *See id.* The same day, the court filed decrees that granted CYF's petitions and involuntarily terminated Father's parental rights to Children. On October 15, 2025, Father timely filed separate notices of appeal and concise statements of error complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i), wherein he raised challenges to section 2511(a) and (b). *See* Concise Statement,

---

[8] Father was unable to physically appear at the termination hearing as Mother absconded with his truck the day of the hearing. *See* N.T., 9/15/2025, at 87. Father explained that he is unable "to get around" without assistance and access to his vehicle. *See id.* at 88. Based upon this testimony and Father's physical status, it is unclear whether he was able to drive.

10/15/2025, ¶¶ 4-5. On November 4, 2025, we consolidated the above-captioned cases sua sponte. *See* Pa.R.A.P. 513.

On November 17, 2025, the orphans' court filed a consolidated opinion pursuant to Rule 1925(a)(2)(ii) wherein it addressed Father's challenges to the sufficiency of the evidence pursuant to section 2511(a)(1), (2), (5), and (8). *See* Orphans' Court Opinion, 11/17/2025, at 1-17. The orphans' court again omitted any discussion or mention of section 2511(b). *See id.*

In his brief, Father has raised the following issues for our consideration:[9]

I.    Whether the [orphans'] court erred in terminating the parental rights of Father pursuant to [section] 2511(a)(1), (2), (5), and (8) of the [Act].

II.    Whether the [orphans'] court erred in concluding that termination of parental rights would best serve the needs and welfare of [Children] pursuant to [s]ection 2511(b).

---

[9]  Objections were raised challenging the subject matter jurisdiction of the orphans' court during these proceedings. *See* N.T., 9/15/2025, at 43-45; *see also Roman v. McGuire Memorial*, 127 A.3d 26, 33 (Pa. Super. 2015) ("Subject matter jurisdiction relates to the competency of a court to hear and decide the type of controversy presented."). Some of the parties maintained that jurisdiction properly lay in Delaware since Children were originally removed from Parents' custody there. *See id.* Although the parties have not pursued these claims, this Court is empowered to address issues of subject matter jurisdiction sua sponte. *See Yoder v. McCarthy Construction, Inc.*, 345 A.3d 668, 675 (Pa. 2025) ("[L]ack of jurisdiction of the subject matter may be raised at any time and may be raised by the court sua sponte if necessary."). Pennsylvania law provides that "[t]he court of common pleas of each county shall exercise through the appropriate division original jurisdiction over … involuntary termination." 23 Pa.C.S. § 2301. Furthermore, involuntary termination proceedings may be brought, inter alia, "in the court of the county" in which is located "an office of an agency" that has custody of the subject child. 23 Pa.C.S. § 2302(2). As CYF had custody of Children when these proceedings were initiated, there is no jurisdictional impediment.

Father's Brief at 5 (suggested answers omitted; unnecessary capitalization omitted).[10]

**Standard of Review and Applicable Law**

Our standard of review in this context is well established:

> In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the [orphans'] court's findings of fact and credibility determinations if they are supported by the record. Where the [orphans'] court's factual findings are supported by the evidence, an appellate court may not disturb the [orphans'] court's ruling unless it has discerned an error of law or abuse of discretion.

> An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to [orphans'] courts, who often observe the parties first-hand across multiple hearings.

> In considering a petition to terminate parental rights, a[n orphans'] court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing

---

[10] We note with displeasure that no attorney representing Children filed a brief before this Court on appeal. During the termination hearing, Attorney Shirey advocated that A.J. was in favor of reunification. *See* N.T., 9/15/2025, at 95. Attorney Benson reported that his client was "unable" to express a preference regarding termination because of her young age. *See id.* at 95-96. Attorney Doucette advocated in favor of termination during the proceedings. *See id.* at 96.

evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

***Interest of M.E.***, 283 A.3d 820, 829-30 (Pa. Super. 2022) (citations and quotation marks omitted). We also remain particularly mindful that, owing to the "serious impact attending the termination of parental rights, it is important that a judicial decree extinguishing such rights be based solely on competent evidence." ***In re Adoption of C.M.***, 255 A.3d 343, 358 (Pa. 2021) (citations and quotation marks omitted).

The involuntary termination of parental rights is governed by section 2511, which calls for a bifurcated analysis that first focuses upon the "eleven enumerated grounds" of parental conduct that may warrant termination. ***M.E.***, 283 A.3d at 830; ***see also*** 23 Pa.C.S. § 2511(a)(1)-(11). If the orphans' court determines that a petitioner has established grounds for termination under one of these subsections by "clear and convincing evidence," the court then assesses the petition pursuant to section 2511(b), which focuses upon the child's developmental, physical, and emotional needs and welfare. ***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013). This Court need only agree with the court's determination as to any one subsection of section 2511(a), in addition to section 2511(b), in order to affirm. ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (en banc).

The orphans' court terminated Father's parental rights pursuant to section 2511(a)(1), (2), (5), (8), and (b), which provide as follows:

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\*     \*     \*

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

\*     \*     \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\*     \*     \*

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1)-(2), (5), (8), (b).

## Section 2511(a)

We will begin our review by addressing seriatim the orphans' court's bases for termination under section 2511(a).

## (a)(1)

In order to satisfy the requirements of section 2511(a)(1), the petitioning party must "produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties."[11]  ***In re Adoption of***

---

[11]  As noted in the statutory text, our General Assembly has mandated an emphasis upon "the six months immediately preceding the filing of the termination petition," which is the "most critical period for evaluation." ***In re Adoption of L.A.K.***, 265 A.3d 580, 592 (Pa. 2021).  Our Supreme Court, however, has instructed that courts also "avoid a mechanical application of the law regarding the termination of parental rights." ***Id.*** at 593.  Thus, we must also consider the "whole history of a given case" while analyzing section 2511(a)(1). ***C.M.***, 255 A.3d at 364.

*C.P.D.*, 324 A.3d 11, 26 (Pa. Super. 2024) (cleaned up). Our Supreme Court

has offered additional authoritative guidance on this inquiry:

> Parental duties are not defined in the Adoption Act, but our courts long have interpreted parental duties in relation to the needs of a child, such as love, protection, guidance[,] and support. Parental duties are carried out through affirmative actions that develop and maintain the parent-child relationship. The roster of such positive actions undoubtedly includes communication and association. The performance of parental duties requires that a parent exert himself to take and maintain a place of importance in the child's life. Fortitude is required, as a parent must act with reasonable firmness to overcome obstacles that stand in the way of preserving a parent-child relationship and may not wait for a more suitable time to perform parental responsibilities.

*L.A.K.*, 265 A.3d at 592 (cleaned up). A court's assessment under section

2511(a)(1) "must examine the individual circumstances and any explanation

offered by the parent to determine if that evidence, in light of the totality of

the circumstances, clearly warrants permitting the involuntary termination of

parental rights." *Id.* at 593. This includes consideration of, inter alia, (1) the

parent's explanation for his or her conduct; (2) post-abandonment contact

between the parent and child, in any, including any efforts made by the parent

to re-establish contact with the child; and (3) the effect that termination of

parental rights would have on the child pursuant to section 2511(b). *Id*.

The orphans' court concluded that Father's parental rights should be

terminated pursuant to section 2511(a)(1), under the following rationale:

> For at least six months prior to the termination proceedings, Father failed in his parental duties. It does not appear that Father can independently care for [C]hildren. Chief amongst the concerns around Father's failure to fulfill parental duties was Father's inability to provide for the stability of [C]hildren…. Father

has not been able to provide proof of income or evidence of a stable environment for [C]hildren. While Father lived apart from [C]hildren in a separate state, he did not send them cards, gifts, or letters; nor did he provide for their financial, physical, or emotional support in his absence. These failings occurred for a period of at least six months immediately preceding the filing of the petition for termination. By clear and convincing evidence, [CYF] met its burden pursuant to [section] 2511(a)(1) and termination was appropriate.

Orphans' Court Opinion, 11/17/2025, at 12-13.

Father argues that the orphans' court's findings are not supported by the certified record. **See** Father's Brief at 19 ("[CYF] did not meet its burden, as the record does not support a finding that Father evidenced a settled purpose of relinquishing his parental rights or failed to perform parental duties[.]"). Based upon the available record, we agree.

Specifically, the orphans' court's findings do **not** include the statutory elements and considerations required by our case law. **See L.A.K.**, 265 A.3d at 592. With respect to Father's purported lack of housing and income, there is no indication that the orphans' court acknowledged, or even considered, Father's explanation for his inability to financially support Children or obtain "appropriate" housing—namely, the loss of both his legs. **See id.**; N.T., 9/15/2025, at 77-78, 80. Furthermore, the orphans' court's suggestion that Father failed to maintain contact with Children overlooks Father's consistent participation in supervised visits with them since their removal from his care. **See** N.T., 9/15/2025, at 21-22, 80; **see also** CYF Exhibit 7. Thus, the court also failed to recognize substantial "post-abandonment contact" between

Father and Children in the form of "communication and association." *See L.A.K.*, 265 A.3d at 592.

Additionally, the orphans' court's analysis under section 2511(a)(1) seemingly ignores the obvious "obstacles" that Father encountered in maintaining his relationship with Children based upon his status as a bilateral amputee and his hospitalization in another state. *Id.* The court's analysis and findings do not reflect that it endeavored to assess whether Father had responded with "reasonable firmness" under these particular circumstances. *Id.* We emphasize that "the focus under [section] 2511(a)(1) is **not** the degree of success a parent may have had …, but examines whether, under the circumstances, the parent has utilized all available resources to preserve the parent-child relationship." *C.M.*, 255 A.3d at 365 (emphasis added). Finally, as discussed in detail infra, the orphans' court neglected to consider the effects of termination upon Children pursuant to section 2511(b). Based upon the foregoing, we conclude that the record does not support the orphans' court's decision that termination of Father's parental rights was warranted pursuant to section 2511(a)(1).

### (a)(2)

We now turn to the orphans' court's findings pursuant to section 2511(a)(2). In order to satisfy the statutory elements of section 2511(a)(2), the petitioning party must adduce clear and convincing evidence establishing: (1) repeated and continued incapacity, abuse, neglect or refusal by the subject

parent; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. *See In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021). Grounds for termination pursuant to section 2511(a)(2) "are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied." *Id.*

The orphans' court provided the following rationale for termination of Father's parental rights pursuant to section 2511(a)(2):

> Grounds for termination under 23 Pa.C.S. § 2511(a)(2) were established by Father's incapability or refusal to address his service goals in a manner that would have allowed him to progress beyond supervised visitation…. Father was inconsistent in his communication with [CYF] and refused services offered by [CYF] to assist with his family service plan goals. While residing in Delaware from April 2024 to April 2025, Father was inconsistent in his contact with [C]hildren; Father only resumed regular contact with [C]hildren upon his return to Pennsylvania. Father's behavior towards [Children's] foster parents caused enough concern that the foster family was no longer willing to have contact with Father. Father was never able to provide proof of suitable housing for [Children]. [CYF] demonstrated that his continued neglect or refusal caused [C]hildren to be without essential parental care, control, or subsistence necessary for their physical or mental well-being.

> Turning to the final element of 23 Pa.C.S. § 2511(a)(2), the temporal element, [Children's] dependency cases dragged on for approximately fifteen months as of the termination hearing. Father did not demonstrate any progress towards the family service plan goals in place. Over those fifteen months, Father clearly could not or would not remedy his inability or refusal to provide the essential care for [Children's] physical and mental health as required. Despite fifteen months of effort, Father continued to refuse services provided by [CYF] and failed to establish stability for [C]hildren.

- 20 -

Orphans' Court Opinion, 11/17/2025, at 13-14. Father maintains that the orphans' court's findings are not sufficiently supported by the evidence of record. *See* Father's Brief at 19-21. Again, we agree.

With respect to the first two elements of section 2511(a)(2), our review indicates that crucial portions of the orphans' court's findings are not supported by the record. While the court found that Father was "inconsistent" in his communication with CYF and had "refused" services, our review reveals no evidentiary support for these findings. There is an absence of information in the certified record speaking to the communication (or lack thereof) between Father and CYF.[12] The only evidence that appears in the record on this subject suggests that Father remained in touch with CYF during his time in Delaware and consistently availed himself of virtual visits with Children. *See* N.T., 9/15/2025, at 30-31, 80. The record does reflect that Father was discharged from Pressley Ridge in August 2025 as a result of a "lack of communication." *Id.* at 50. We note, however, Ms. Orwig testified that Father was hospitalized that month and was unable to communicate with Pressley Ridge or participate in their programming on that basis. *See id.* at 70. We have been unable to locate any evidence in the record suggesting that Father refused services.

_____

[12] The only evidence regarding a failure by Father to communicate with an agency was testimony from Ms. Miller-Lewis indicating he failed to "respond" to communications from Delaware authorities. *See* N.T., 9/15/2025, at 31.

- 21 -

The orphans' court's conclusion that Father was inconsistent in his contact with Children while he was in Delaware is likewise belied by the certified record. Contrary to the court's suggestion, there is no dispute that Father has consistently participated in supervised visits with Children, including virtually while he resided in Delaware. *See* N.T., 9/15/2025, at 21-22, 80; *see also* CYF Exhibit 7. Indeed, the summary from Pressley Ridge indicates that Father participated in thirty-four virtual visits with Children between November 2024 and April 2025 alone. *See* CYF Exhibit 7.

Finally, we have significant concerns regarding the orphans' court's conclusion that Father's efficiency apartment is per se unsuitable for Children. Ms. Orwig explained that CYF considered Father's efficiency apartment to be inappropriate housing because Children "would not have their own bedrooms" and the family would be forced to rely upon "shared bathroom space" with other tenants in the building. *See* N.T., 9/15/2025, at 50. Ms. Orwig admitted, however, that she had never actually visited the apartment in question to assess its suitability. *See id.* at 52. She further conceded that CYF has allowed children to remain in the custody of parents living in analogous situations, i.e., in hotels and shelters with shared living and bathroom spaces. *See id.* at 58-60. Although Ms. Orwig made vague references to "certain guidelines" that required this result, her testimony offered no explanation for this patent inconsistency. *Id.* at 59.

With respect to the third and final prong of section 2511(a)(2), the orphans' court found that Father would not, or could not, remedy his situation since he had allegedly not made "any progress" with respect to his family service plan objectives since Children's removal. Orphans' Court Opinion, 11/17/2025, at 13. The record, however, indicates that Father has made substantial progress with respect to his family service plan objectives, insofar as he has returned to Pennsylvania following his medical incapacitation, secured independent housing, and obtained some level of income, including SSDI. **Compare** CYF Exhibit 1 at 1, 10, **with** N.T., 9/15/2025, at 50, 52, 57-58. At the time of these proceedings, Father explained that he was in the process of saving money for housing that would satisfy CYF's stated requirements. **See** N.T., 9/15/2025, at 77-78. Relatedly, Ms. Orwig averred on behalf of CYF that Father's "efficiency apartment" was the only barrier remaining to his reunification with Children. **See id.** at 57.[13]

_____

[13] Although not directly relevant to the termination decision, we further note that "[b]efore filing a petition for termination of parental rights, the Commonwealth is required to make reasonable efforts to promote reunification of parent and child." **In re Adoption of R.J.S.**, 901 A.2d 502, 507 (Pa. Super. 2006). We also emphasize that "a court may find an agency's lack of assistance to a parent relevant to whether a parent's incapacity 'cannot or will not be remedied by the parent.'" **In re D.C.D.**, 105 A.3d 662, 672 (Pa. 2014) (quoting 23 Pa.C.S. § 2511(a)(2)). Here, the orphans' court's focus upon the fifteen-month length of Children's dependency cases elides the salient fact that Father only received the benefit of any semblance of reunification services from CYF from approximately May 2025 through August 2025, i.e., just four months. **See, e.g.,** N.T., 6/13/2025, at 4 (indicating that

*(Footnote Continued Next Page)*

Based upon the foregoing, we conclude that the orphans' court's factual findings with respect to section 2511(a)(2) are not supported by the record evidence. We therefore conclude that the court improperly terminated Father's parental rights under subsection (a)(2).

### (a)(5)

We now turn to section 2511(a)(5), pursuant to which the petitioning party must produce clear and convincing evidence that: (1) the child has been removed from parental care for at least six months; (2) the conditions that led to the child's removal or placement continue to exist; (3) the parent cannot or will not remedy the conditions that led to removal or placement within a reasonable period of time; (4) the services reasonably available to the parent(s) are unlikely to remedy the conditions which led to removal or placement within a reasonable period of time; and (5) termination of parental rights would best serve the needs and welfare of the child. *See In re B.C.*, 36 A.3d 601, 607 (Pa. Super. 2012).

Preliminarily, we note that the orphans' court inappropriately elected to collectively analyze the grounds for termination at subsections (a)(5) and (a)(8). *See* Orphans' Court Opinion, 11/17/2025, at 14-17. "[O]ur Supreme Court has emphasized time and again that we must hew closely to the

_____

Father began receiving reunification services from CYF sometime in May 2025).

- 24 -

statutory language." *In re Adoption of G.W.*, 342 A.3d 68, 85 (Pa. Super. 2025) (en banc). We emphasize that the individual grounds for termination at section 2511(a) are "distinct," "not interchangeable," and "cannot be conflated." *Id.* Indeed, this Court has specifically disapproved of a court conflating the requirements of section 2511(a)(5) with those of section 2511(a)(8). *See In re I.J.*, 972 A.2d 5, 11-12 (Pa. Super. 2009).

The court made the following findings pursuant to section 2511(a)(5):

> Immediately, the temporal requirements are met. Approximately fifteen months have elapsed from adjudication of dependency and removal of [C]hildren from Father's custody to termination of parental rights, which exceeds the longer of the two statutory periods of twelve months.

> Turning to the additional requirements of 23 Pa.C.S. § 2511(a)(5), the conditions leading to the removal of [C]hildren continue to exist. There was a referral made to [CYF] for inadequate housing in March 2024. The same issue occurred in April 2024, leading [C]hildren to be transferred to Pennsylvania and adjudicated dependent. Father was unable to find childcare or create a plan for childcare in the event of his inability. Thus, when he was hospitalized for several months, [C]hildren were left without any resources. When Father was able to resume caring for [C]hildren following his medical incapacity, he failed to provide suitable housing. The suggested home in Delaware was deemed inappropriate. Father's current residence in Pennsylvania is also wholly inappropriate. The conditions leading to removal clearly persist in that Father remains unable to house [C]hildren.

> As for Father's ability or willingness to address the conditions leading to placement, the [c]ourt was confronted with both inability and unwillingness on Father's behalf. Father would not or could not provide consistent communication with [CYF] or recommended service providers. As such, [CYF] could not assist Father with finding appropriate housing. Additionally, [CYF] was never able to verify Father's financial ability to support [C]hildren. Thus, the conditions that led to placement were not adequately addressed by Father. The readily available services were clearly

unable to remedy the conditions considering Father's refusal to cooperate. Father was recommended to all available services and was not denied any requested services.

Termination best serves the needs and welfare of [Children]. The guardian ad litem, [Attorney Doucette], acknowledged that [C]hildren love their parents, but also that the parents have not done what is needed to reunite with [C]hildren. Attorney Doucette favored termination. Counsel for A.P., Attorney [Benson], stated that A.P. was unable to provide a response on the matter given her tender age. Counsel for A.J., Attorney [Shirey], stated that A.J. was hoping to go home …, but that he was accepting of staying with the foster parents. The [CASA] favored termination, noting that during one supervised visit, Father did not interact with [C]hildren.

Orphans' Court Opinion, 11/17/2025, at 15-16. Our review indicates that there are several fundamental problems with these findings and conclusions.

Beginning with the chronological requirements of section 2511(a)(5), our case law indicates that we measure this time period from the date of a child's removal until the "the date of the filing" of a termination petition, as opposed to the date that termination is granted. *In re S.D.T., Jr.*, 934 A.2d 703, 707 (Pa. Super. 2007). As noted above, however, the certified record does **not** provide a clear date upon which Children were removed from Father's custody.[14] Nonetheless, Ms. Miller-Lewis did testify that either DSCYF or CYF assumed custody of Children sometime during May 2024. *See* N.T., 9/15/2025, at 30, 34. As CYF filed an amended petition seeking termination

---

[14] The orphans' court opines that Children were removed from Father's custody by Delaware authorities on May 15, 2024. *See* Orphans' Court Opinion, 11/17/2025, at 2 (no citation). There is no competent evidence of record corroborating that the removal occurred on this date.

of Father's parental rights in May 2025, we find no error with respect to court's finding that first prong of section 2511(a)(5) was satisfied.

The remainder of the orphans' court's findings under this subsection, however, raise concerns. With respect to the conditions that led to Children's removal, the orphans' court largely emphasizes Father's failure to provide appropriate housing. As detailed in our discussion of Ms. Orwig's testimony under section 2511(a)(2), the allegedly inappropriate nature of Father's current housing is not supported by the record. *See* N.T., 9/15/2025, at 50-52, 57-60. The orphans' court's findings on this point also suggest that Father was "able to resume caring for [C]hildren following his medical incapacity," but simply failed to do so. Orphans' Court Opinion, 11/17/2025, at 15. This conclusion is highly questionable, however, as the certified record strongly suggests Father continues to struggle in his recovery from bilateral amputation, and that his challenges with housing and income are directly connected to his medical problems. *See* N.T., 9/15/2025, at 77-78, 80. Moreover, on this point we note that section 2511(b) states: "The rights of a parent shall not be terminated solely on the basis of environmental factors such as **inadequate housing**, furnishings, **income**, clothing and medical care **if found to be beyond the control of the parent.**" 23 Pa.C.S. § 2511(b) (emphasis added). The only testimony adduced by CYF on the question of the cause of Father's income and housing concerns was from Ms. Miller-Lewis, wherein she disclaimed having any knowledge regarding the

potential implications of Father's amputations. **See** N.T., 9/15/2025, at 35-36.

The orphans' court's finding that Father was unwilling or unable to remedy the conditions of removal largely reiterates the court's findings that he had failed to provide housing and financial support to Children and was deficient in his communication with CYF and services providers. **See** Orphans' Court Opinion, 11/17/2025, at 16. As a general matter, this portion of the court's analysis is not particularly responsive to the statutory inquiry. Further, the court's findings ignore the evidence demonstrating Father's progress with respect to returning to Pennsylvania, obtaining independent housing, and generating income after just four months of reunification services, including his ongoing efforts to save sufficient money to obtain housing that meets CYF's requirements. **See** N.T., 9/15/2025, at 50, 52, 57-58, 77-78. To the extent that the orphans' court also references Father's failure to communicate with Pressley Ridge, again, the certified record (through testimony provided by CYF) indicates this was attributable to Father's hospitalization in August 2025, as opposed to mere indolence. **See id.** at 69-70. As noted above, there is no other evidence in the certified record to support a finding that Father failed to communicate with service providers.

Finally, and for the reasons discussed in our review pursuant to section 2511(b), the orphans' court's conclusions with respect to Children's needs and

welfare pursuant to section 2511(a)(5) is incomplete.[15] Other than reporting the viewpoints espoused by Children's attorneys, the orphans' court's analysis does not indicate that it considered those recommendations in the light of the available evidence of record. Nor did the court make any relevant, independent findings concerning Children's needs and welfare as required by the Act.

As the orphans' court's findings pursuant to section 2511(a)(5) are not supported by competent evidence, we conclude that the court erred by terminating Father's parental rights under this subsection as well.

### (a)(8)

Finally, we turn to consider the orphans' court's findings with respect to section 2511(a)(8). As noted above, the court has not set forth an independent analysis of this subsection in derogation of our case law. Our case law provides that we utilize the same approach in ascertaining whether the first chronological element of section 2511(a)(8) has been established as utilized pursuant to section 2511(a)(5), i.e., measuring the time period from a child's removal from a parent's custody until the filing of a termination petition. *In re E.J.C.*, 335 A.3d 1222, 1232 (Pa. Super. 2025). As noted above, however, the date of Children's removal from Father's custody cannot

---

[15] Although the needs and welfare analysis of section 2511(a)(5) and (b) are separately delineated, our appellate courts routinely utilize the same legal standards for both. *G.W.*, 342 A.3d at 89 n.20.

be ascertained from the certified record. While CYF filed its amended termination petition raising section 2511(a)(8) on May 20, 2025, we have no way of verifying that the petition was filed twelve months after Children's removal from Father's custody sometime in May 2024. *See* N.T., 9/15/2025, at 30, 34. For this reason alone, the orphans' court erred in finding sufficient grounds exist to terminate Father's parental rights to Children pursuant to section 2511(a)(8).

**Section 2511(b)**

Assuming we could overlook the significant shortcomings in CYF's presentation and the orphans' court's factual findings under section 2511(a) detailed above, we would nevertheless be compelled to vacate the termination decrees based upon CYF's failure to adduce information in support of its case under section 2511(b) and the orphans' court's failure to make any of the findings or determinations required by that provision. "[I]f the court determines that the parent's conduct warrants termination of his or her parental rights," it should "engage in the second part of the analysis pursuant to [s]ection 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child." *Interest of K.T.*, 324 A.3d 49, 56 (Pa. Super. 2024) (citation omitted); *see also* 23 Pa.C.S. § 2511(b). We emphasize that section 2511(b) "focuses not on the parent's conduct, but on the children and their needs." *In re Adoption of R.J.S.*, 901 A.2d at 508. Thus, a court's analysis of section 2511(b) "should consider the matter from

the child's perspective[.]" **K.T.**, 296 A.3d at 1105. Furthermore, the orphans' court's determination pursuant to section 2511(b) must be rendered on a case-by-case basis and in light of each child's specific needs and particular circumstances. **See id.** at 1105-06 (citing **L.A.K.**, 265 A.3d at 593).

To that end, our Supreme Court has identified several specific aspects of the child's needs and welfare that the orphans' court must always consider in this context. **See id.** at 1106. These include: (1) the nature and extent of the child's "bond with the biological parent"; (2) whether the child is "in a pre[]adoptive home and whether they have a bond with their foster parents"; and (3) intangibles such as love, comfort, security, stability, and permanency. **Id.** at 1106, 1109. These factors are each of "primary importance" in the context of section 2511(b). **Id.** at 1109.

As to the child's bond with the biological parent, our case law directs courts to discern "the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond." **Matter of Adoption of L.C.J.W.**, 311 A.3d 41, 48 (Pa. Super. 2024) (internal citation omitted). Accordingly, "[t]he court must consider whether a natural parental bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." **Interest of J.R.R.**, 229 A.3d 8, 13 (Pa. Super. 2020) (internal citation and quotation marks omitted). This Court has vacated and remanded

cases where the orphans' court failed to fully explore the "emotional impact" of terminating a parental bond. ***See, e.g., id.***; ***S.D.T.***, 934 A.2d at 709.

Here, the orphans' court failed to issue any findings pursuant to section 2511(b), including the required assessment of Children's bond with Father and the impact (if any) of severing that bond. ***See generally*** Orphans' Court Opinion, 11/17/2025, at 1-17; N.T., 9/15/2025, at 101-03. This omission is particularly troubling since the only available evidence of record indicates that Children were closely bonded with Father. Indeed, CYF's own documentation corroborates this fact. ***See*** CYF Exhibit 1 at 1 ("Father and [C]hildren are well bonded. Father shows love and concern for [Children]."). Attorney Doucette similarly reported that there was "no doubt" that Children loved Father. ***See*** N.T., 9/15/2025, at 96. While A.P. was unable to express a preference in these cases because of her young age, A.J.'s counsel reported that his client was "desperate" and "adamant" in his desire to be reunited with his biological family. ***See*** N.T., 6/13/2025, at 4; N.T., 9/15/2025, at 95.

The orphans' court erred as a matter of law by failing to conduct the required analysis under section 2511(b). Moreover, with the existence of a bond between Children and Father clear, and no evidence presented regarding the effect on Children of terminating that bond, there was no basis for the orphans' court to find that Children's needs and welfare were best served by terminating Father's parental rights.

**Conclusion**

The orphans' court's findings of fact relied upon to terminate Father's parental rights to Children under section 2511(a)(1), (2), (5), and (8) are largely unsupported by the record. To the extent the court relied upon Father's lack of income and suitable housing to support its termination decision, the evidence of record shows that these environmental factors were beyond Father's control. We therefore conclude that the decrees terminating Father's parental rights under section 2511(a) must be reversed. Further, the court erred as a matter of law by terminating Father's parental rights without analyzing the record or making the requisite findings pursuant to section 2511(b).

Decrees reversed. Jurisdiction relinquished.

Judgment Entered.

_____
Benjamin D. Kohler, Esq.
Prothonotary


Date: 04/13/2026